representing the Secretary of Commerce and the Assistant Administrator of the National Marine Fisheries Service, Laura Kloss, will present oral argument for five minutes of our time on behalf of AMICI addressing the issue of standing. This case concerns the question whether tuna that may be lawfully imported into the United States can be labeled as dolphin safe. The District Court erred for two main reasons. First, the District Court below ignored fundamental principles of administrative law and erred in finding that despite NOAA's compliance with the International Dolphin Conservation Program Act of 1997, its final finding was arbitrary and capricious under the Administrative Procedure Act. Second, the District Court erred as a legal matter in ordering the extraordinary remedy of a remand with instructions to preclude the Secretary from subsequently complying with the IDCPA. Each of those questions are reviewed de novo by this Court and no deference is given to the District Court's decision. First, the District Court erred in three fundamental ways on the merits of this case. It ignored fundamental principles of administrative law. This is a case where there was mixed scientific evidence that was reviewed by an agency. And in those circumstances, the United States Supreme Court has made very clear in Baltimore Gas and other cases, and this Court has upheld those cases and interpreted them consistent with the administrative record that in scientific discussions and scientific record that is mixed, the agency is entitled to great discretion. Sotomayor, I've read your brief and I've read Judge Henderson's decision, and I thought your brief was very well written, but the problem I'm having here is that the District Court didn't ignore what the agency did. What the District Court said was that you didn't follow the statute. And we don't defer to an agency who doesn't follow statutorily mandated procedures. So what is your response? That's the problem I'm having with the case. Number one, I have a couple of responses. Number one is the agency is entitled to deference on how a statute that it is given the purview to operate, how they should interpret it. Is it ambiguous? The District Court didn't think it was ambiguous. Well, I'm not exactly sure. Are you talking about the studies that needed to be done or the finding? The studies that needed to be done. Well, okay. The studies that need to be done, I think it's fair to say they are. It is ambiguous. He ordered that certain studies – that Congress ordered that certain studies had to be done, but there was never any indication of how those had to be done or much information on what was actually going to be required in those studies. And the Supreme Court has also made clear in cases such as that where they say go do a study, an agency also has incredible discretion on how to conduct those studies. Could you just help me with the language of the statute that's ambiguous? The language of the statute, yes. For the studies that have to be done, there is a one-year Let's just give me the section, if you could. I know that there are so many subsections that Sure. It's section 1385. And there's basically two studies that are at issue here. One is the necropsy study, which says that there has to be a three-year review of necropsy samples of dolphins that died during this process. And the second one that's at issue is the chase and release study that was ordered, an experiment, as the statute says. And how many studies, how many dead animals were studied? Just help me out again. There were 56 dolphins during the three-year period of that study that were captured. And part of that is due to the fact that the realities here are that the fishery is extremely successful. There's not a lot of dead dolphins to study. And they've significantly reduced the death of dolphins from over 300,000 a year to less than 2,000 a year. So there were not as many studies. At the end of the day, it turned out that there were not as many dolphins that could be studied. But that is not inconsistent with the plain language of the statute that simply says go conduct a necropsy study. The only requirement that was given was that it had to be over a three-year period. And there were necropsy analysis done in 1999. There were necropsy analysis done in 2000. And there were necropsy analysis done in 2001. So there really isn't a question here that considering the deference that's due to the agency, that they complied with that statute. Now, admittedly, it wasn't enough to get population results, but that wasn't a requirement that Congress instituted. In fact, this was just the two studies that Judge Henderson picked up on were just two pieces of a much larger puzzle that were put together. There were 40-some-odd scientific reports that were done. There's literally thousands of pages in the record, hundreds and hundreds of hours that were put into making this determination. So it's really unfair to go in and pick out these two studies and say, oh, well, this is really how we're just going to throw this out. So the basic principle here is that the agency's due deference, not only on how the study's done, but in how you're going to interpret that evidence. And there were the evidence here was inconclusive on at least three of the four major factors. What we do know, however, is that the direct mortality was significantly within normal range. There's evidence, the evidence in the record suggests that even considering the cow-calf indirect effects, the cow-calf separation, the indirect effects of cow-calf separation, the direct mortality was between 31% for one species and 39% of the potential biological removal. So what we can say with assurity is that the direct effects of the purse seine netting are not a significant harm to these dolphins. With regard to the ecosystem and with regard to the additional, the growth rate, it was less conclusive here. But that's exactly where agencies are entitled to deference, is in determining which of this purse seinese was the, I thought there was, I thought, I'm sorry, I thought there was pretty much evidence that there wasn't much growth rate at all. There's inconclusive evidence on what the growth rate is. There is some suggestion that it's between 1 and 2%. There is also some evidence that it might be lower than that. And under one scenario, there's no question that for one of the species, there is the potential that it may be negative. But the problem is none of that was conclusive. And the best estimate is that even if you accepted that the growth rate wasn't where it needed to be, how can you tie that directly back to the fishery? And there wasn't enough evidence to do that. But you, we said you were required to do some definitive conclusions. And that's exactly what the agency did here, was make definitive conclusions on the best record available before him. Tell me again why you couldn't do more of the studies of the dead dolphins. Well, there's a whole number of reasons why. Because you said they were doing so well? Well, number one, they were doing so well. What has to happen here, first off, you have to go and train foreign individuals to go on these foreign vessels, because there's no United States vessels that are actually doing this purse seine netting right now. So you have to train them. You've got to get, you've got to get through customs. They had to send necropsy kits down through customs. They had to train people. They trained 25 some odd people to do this. And a lot of the foreign countries just didn't send them out on the boats. Once they went out on the boat, you actually had to be on a boat where a dolphin was killed in the purse seine netting. And the reality on the ground is it's just not happening very often. And usually what's happening, there's about 5,000 sets done. There's only about 1,000, a little over 1,000 of these dolphins that are killed each year. To get to the ranges that NOAA initially had indicated had to be done, it would have required necropsying 200 of the 1,000 that died. So it would have been a much larger project. Everybody recognized that from the beginning. Earth Island wrote a letter in 1999 when this first started, said you can't do this. You're not going to be able to get the population data that you need. Everybody recognized that it was going to be a problem. So, and Earth Island's letter is... Well, I'm not sure which way that cuts, that that excuses you from performing statistically significant sampling of the whales, of the dead animals. We're not arguing that we're excused from doing it. What we are arguing is that Congress told us, go and do a three-year study. We did a three-year study with the best we could under the international concerns, the cooperation that we had to receive, the permits that we had to receive, the training that had to be done, the kits that had to be analyzed, the scientists that had to analyze this data. They did the best they could with what Congress told them to do, and there was no indication. It actually doesn't make sense that Congress would have imposed the restrictions that they did and still expected population data to come out of that necropsy study. It's almost impossible that it would have happened, because it would have required training ten times the number that it did. Well, then how can you draw a conclusion that this kind of fishing isn't having an effect? We draw the conclusion based on other information that's in the record, okay? What we look at, we're looking at the necropsy study and we're saying, hey, this could cut both ways. Admittedly, the information we got from the necropsy study --. You're not basing it on what Congress said you were supposed to base it on. That's not accurate. Congress said, you look, they mandated some stress studies, including the CHESS study, which is the catch and release, and the necropsy study. They also said, go out and get information, any other information that's available. So it's not, Congress did not limit NOAA to looking solely at these studies, and that's one of the main problems that the district court had here, was it picked out these two and said, you were wrong on these, therefore everything's wrong, and ignored the fact that there was a lot of other evidence in the record. And the necropsy study actually supported that these were healthy dolphins. Remember, these were dolphins, they were necropsying, that were killed during the purse seine netting, and there wasn't even evidence that those dolphins that were killed during the purse seine netting, that the purse seine netting was having a substantial impact. So which way does that cut? I mean, I think it's a fair assumption to say that it's inconclusive on those two main studies, but the direct mortality and the other evidence that was in the record was enough that the secretary was well within his discretion, well within his discretion to make the finding that he did here, that there was no significant impact. I just want to hit one main point, and then I will reserve some time for the rebuttal, and that is that whatever this Court finds on the merits here, the district court clearly overstepped its grounds and again ignored administrative law principles in failing to remand this to the agency for further proceedings. The Supreme Court has made very clear that only in rare circumstances can you take that discretion away from the agency to go on with further proceedings. You know the problem with that argument, and maybe it's not a problem, and you correct me if I'm wrong, Congress fixed a cutoff date. They funded for a period of time. So what would happen on remand? You'd be certainly substantially beyond the cutoff date, and there's nothing to indicate they'd be funding to do anything with it because the studies were funded for a period of time. So when you say remand, under normal circumstances, I understand remand. When there's a cutoff date and the question of funds, I'm not so sure remand is automatic. Judge Ferris, that's a very good question. A similar question went up to the Supreme Court in 2003, and in that case, the Supreme Court held on a 6-3 decision that the cutoff date is not determinative of whether you remand this to the agency. I mean, the other option here would have been for NOAA to say, hey, we don't have enough evidence, we need more time. And I think they would have been well within their rights to do it. Instead, they said, we're going to make a finding here. They have actually done additional studies. There's a 2003 stock assessment study that's been done. There's another one coming up in 2007. A reply brief and a footnote outlines all the additional appropriations. $2.3 million has been appropriated for additional studies. So there's a lot more that can be done. There's a lot more that will be done. And that's really what the law requires here. This is not so rare of a circumstance that the case should not be remanded back to the agency for further proceedings. With that, I would say that's it. I know that's not the reason that the Court used. The Court had its own reasons. And that's what we are going to have to also deal with. But that was one point that you ---- Well, in Brouwer, in our previous decision in this case, what was the bottom line of that so far as what happened to the case? Yeah. The bottom line in Brouwer was a totally different case, by the way. There was absolutely no evidence in the record at all at that point. You know, it was an initial finding. And basically, my understanding there was just move on to the final finding. It doesn't really make sense to send the initial finding back when you had a final finding coming two years after that. So I don't believe that was actually sent back. But, I mean, it was a different ---- it's a totally different circumstance, really. I mean, here the agency should be entitled to the benefit of this Court's decision, if it decides against the agency here, and be able to fix those problems. With that, I'd reserve the remainder of my time. Thank you. May it please the Court. Laura Klaus for the Latin American Governments. The Department of Commerce has given us five minutes to discuss standing. In this case, there's no dispute about what the requirements for standing are. None of the parties dispute the irreducible constitutional minimum for standing, nor do the parties dispute whose burden it is to establish standing. It is the plaintiff's burden. The question is whether the plaintiffs have satisfied those requirements for standing. And it is our position that they have not, not on any of the three or four tuna boats to use encirclement nets in the ETP, which will cause more encirclement of dolphins, which will deplete the dolphin population, which will in turn hinder the plaintiff's ability to watch, photograph, study, and enjoy dolphins. It will lead some to stop purchasing canned tuna for fear that the tuna they have purchased will not be dolphin safe. It will lead to breach of private agreements with Earth Island Institutes, monitoring efforts more difficult, because captains on ships may lie. I think in the course of briefing, Earth Island has focused more on that first alleged injury, and that is hindering the ability to photograph, watch, and enjoy dolphins. You know, I gathered that somebody thought that from reading the brief. And I thought, well, here's somebody being clever and sarcastic on what somebody else thinks is a very serious problem. Do you think the only reason they're here is because they want to photograph? What their affidavits in support of their standing argument state is that they feel that their ability to enjoy, study, and watch dolphins will be jeopardized. We think that that chain of causation, and I don't mean to belittle it, but it is a chain of causation that has many links to it. And we think that the links are not strong enough and that the timing of the alleged injury is not sufficient to fall within the parameters set forth by the Supreme Court. And that is that the injury be imminent, that it be direct, concrete, not speculative, not hypothetical. And that hasn't been established in this case, because there is no evidence. The strongest case that supports you that there's no standing here. Lujan is probably the strongest case, because in Lujan, the Court went through each of the standing requirements. Lujan was the Secretary of Interior. What's the full title of it? Oh, it's, I have it right here. I always refer to it as Lujan. It's, Lujan v. Defenders of Wildlife. And the site is 504 U.S. 555. I think Lujan is the most instructive on this. And in Lujan, the Court found that the plaintiffs failed to show standing both with respect to the concrete injury and redressability. And that, too, is an issue in this case. And if I can just go through what this case is not about, it does not involve a rule or order that will authorize the taking or killing of dolphins. It does not involve a rule or order that degrades the environment. Indeed, the Latin American countries have an interest in the sustainability of the marine ecosystem and in the protection of dolphins and sharks and turtles and juvenile tuna as well. This is not a case that involves endangered or threatened species. It is a case in which the relief that the plaintiffs seek will not have an outcome or not have an effect on the alleged injury, because this isn't a case in which tuna that is not lawfully sold in the United States will become lawfully sold. It will have no effect on the tuna sold. In fact, it won't have an effect on the majority of tuna sold, because Earth Island has agreements with what it stated was about 90 percent of the canneries and hundreds and hundreds of processors and importers to maintain the dolphin safe label. So what this case involves is a concern. I'm not sure I understand when you said that it will have no effect. Labeling doesn't affect what's sold? The labeling will affect merely the label that's put on tuna that's sold. It will not affect whether tuna that is caught using purslane nets can legally be sold in the United States. It can't. And when the impact is based on third parties or based on hypothetical concerns, then it's not direct and concrete enough. I don't want to take up my counsel's rebuttal time, so unless there's further questions, I'll sit. We'll give counsels a couple minutes for rebuttal. Thank you. Good morning, Your Honors. Richard Mooney on behalf of Earth Island Institute and the rest of the plaintiffs. Because it's a preliminary question, I thought that I would start with the standing issue. I'm sure that Your Honors are well aware that we take these issues very seriously. We've litigated these issues for dozens of years and spent thousands of attorneys' hours, and it's not simply some game to us. I think that the Japan Whaling Association case makes very clear that we have more than satisfied the requirements for standing. The Supreme Court in that case was unanimous on the issue of standing. All nine justices found standing. It was not an Endangered Species Act case. The question was whether the Secretary should be forced to certify that Japan was not properly complying with International Whaling Commission requirements. And in theory, that might have caused Japan to kill fewer whales, and in theory, that might have caused more whales to be available to the individuals who wanted to go view whales. That was more than enough to satisfy the standing requirement, and we fit precisely within that case. The declaration submitted in support of the preliminary injunction request made clear that numerous individuals had specific concrete plans to go view dolphins in the affected areas. I'd also draw the Court's attention to one case recently decided in the Ninth Circuit. In fact, Judge Schroeder authored the Earth Island Institute, another case where the plaintiffs versus Ruthenbeck, 459 F. 3rd, 954, from Austin. In that case, there was no showing that the potential destruction of a certain amount of spotted owl habitat would kill a specific number of birds, and that someone would specifically then not see that bird. And there was a challenge to standing, and the challenge was rejected. So unless there's anything, any questions on standing, I'd like to move on to the substance of the dispute. And I know that the Court in the argument so far has focused largely on the issue of whether the Secretary complied with the Congressional mandate to do the studies that he was directed to do. And it's pretty clear the answer to that is no, and I'd like to get to that in a few minutes. But I think a potentially more important question here is whether, setting aside that failure, there was any evidence at all to support the Secretary's finding. And Judge Anderson looked at this record. He looked at it for a long time. He looked at it thoroughly and carefully. He wrote a long, detailed opinion. And what he concluded was that all of the evidence, although the evidence was not conclusive, and we concede the evidence is not conclusive, all of the evidence supported the view that it was the fishery that was causing these dolphins not to recover. And if I could try to simplify the case a little bit. The government wants to make it a complicated case, but it's not a complicated case. There are three questions. Are the dolphins recovering? The government concedes that the dolphin populations are not recovering. At best, they might be growing a tiny bit. They might recover in 78 years. They might recover in 200 years. There is no dispute that something is having an adverse, a significant adverse impact. So the government, quite rightly, went about trying to decide what was having that significant adverse impact. They reviewed the literature. They pulled together their own scientists. They put together independent expert panels. And they decided that there were three plausible reasons that could be having this impact. There's the lag period, which there was no evidence on, and the government does not argue was the base of the Secretary's decision. So we're left with two choices. It's either the huge change in the environment of the eastern tropical Pacific, or it's the fishery, or possibly both, in which case it still would be a significant adverse impact. And the government admits that there is no evidence to support the view that the ecosystem could have changed enough to be the entire cause of the population's failure to recover. But in lay terms, is that global warming? I don't know if it's global warming, Your Honor. My understanding is that the slight change pointed to the most is a slight raise in the surface temperature of the eastern tropical Pacific. But it is warming. I believe that's correct, Your Honor. But the conclusions in their own final science report are very clear that the data does not support the view that the environment is the cause of the dolphins not recovering. And after the final science report, they pulled together the opinions of the five members of the expert panel on the ecosystem. They all agreed that there might be some impact, but it could not explain the failure to recover. And so then we're left with one possible cause. The only cause is the fishery. Now, what the government wants to do is say, we've done all this study on the fishery, and we can't exactly quantify how many calves die because their mothers are killed and they can't get their milk. And we can't quantify exactly how many dolphins are killed on vessels that don't have observers. And we don't know exactly how many are killed because they are tired after being chased by speedboats for hours on end and are then killed by sharks. And we admit that nobody knows for sure exactly. But all of the scientists say that there is a definite effect, and that the effect could well be enough to cause the entire lack of recovery. Now, in that situation, there simply is no question. All of the evidence points to one cause. All the evidence points to the fact that the other potential cause is incorrect. And on that basis, we believe that the answer is clear. And you probably anticipate that I'm now going to move to the remand point, because this is related. So what the government argues that it is only in the rare case that, you know, we shouldn't allow the agency a second choice. And we agree. And in fact, Judge Henderson agreed. He took a rare step that was only to be done if it was futile, if a remand would be futile. And yet, after consideration, he took that step nonetheless. And there are, I submit, two reasons why a remand would be futile. The first was detailed by Judge Henderson, and that is that the agency has, since October 1997, when they were supposed to start this program, continually dragged its feet, refused to conduct the studies it was supposed to conduct, improperly assigned default positions that it wanted to take, allowed politics to govern their decisions, and basically made a mockery of what Congress told them to do and what this Court in a prior panel told them to do. Kagan. Now, what is the — I'm sorry. Go ahead. I wanted to ask you about the significance of our decision in Brouwer. Well, I think on this particular issue, among others, it's very significant. I think the reason it's significant and the reason Judge Henderson felt it's significant in evaluating futility is that, you know, anyone can make a mistake in terms of what Congress tells them to do, but the Court in the first panel was very clear in saying two things. One, you cannot have a default position. You must go and do the best you can with the best available scientific evidence. And, two, you cannot allow political influences to affect the decision. Congress has asked you a yes-or-no scientific question. And the evidence is quite clear that the agency ignored both of those directives, in addition to ignoring its obligation, again, to do reasonable studies of stress effects, the necropsy studies and the chase and encirclement studies that were discussed. Now, counsel has suggested that the remand issue should be reviewed de novo, and in one sense, I think that that's correct. The second futility point I'm about to address, I agree. But on this point, I think that that's wrong. Judge Henderson has seen the Secretary and the agency and the litigation strategy for many, many years, and he had in front of him not only the cold record that is before this Court, but also the agency's actions in litigating the case, in withholding documents that demonstrated the government that they didn't have to do what Congress told them. And I think that Judge Henderson could evaluate that with his own eyes and ears, and that that futility, the conclusion that the agency would not do what it's supposed to do, even if given a third chance, is one that is entitled to deference for that reason. If I may, Your Honors, it's also, a remand would also be futile for another reason, and that is, even if the government did finally do the thing, and the necropsies, that evidence could not, on its own, support a conclusion that the fishery was not having a significant adverse impact. And the reason for that is that it's not just the dolphins who are killed in the nets that are killed by the fishing practice. It is the calves, who would never be found in either of those studies. It is the animals that suffer from kidney damage and muscle damage through the repeated stress of being chased as often as once a month by these speedboats, who subsequently weaken and die. It is through the predation of sharks and pilot whales on animals that are weakened by the chase. And none of those animals would even show up in these studies. Those studies could provide additional evidence that chase and encirclement kills the dolphins. And is sufficient to explain at least a portion of the failure to recover. But there's no way they could prove the negative. The only way to prove the negative, or even to obtain evidence of the negative, is to come up with another reason for the failure to recover. And the CHESS study and the necropsy study have nothing to do with the environment and would not provide any evidence at all on the other potential cause of the failure to recover. So for those reasons, we believe, in addition to the fact that Congress did specifically mandate that the conclusions be made by 2002, and here we are in 2006, and soon it's going to be 2007, we believe that the time has passed for any further remand. And the reason I address this point first, and I want now to go to the question of whether the agency adequately conducted the studies they were required to, is, you know, hinted at by the remand issue, it's not even important to decide, it's not necessary to decide the case to evaluate whether the studies were properly done or could have been properly done. Because they collected all the evidence they have, and the evidence all points in one direction, and a decision of Judge Henderson should be affirmed on that basis. On the alternative ground that the Court is not convinced of that, and the Court accepts the government's view that there is a reasonable mix of scientific evidence here, I want to touch briefly on the required studies. There's no question, I mean, Congress was very clear, in fact, Your Honor, it was in Section 1441A that 1385 correctly instructs them to do the test, but it's 1441A in which the actual tests are described. But counsel correctly says that there are two tests, there's the necropsy study and the chest study. And I think if you, we said it in our brief, so I'd like to reiterate briefly the reasons that the government's position is way off base here. Judge Henderson correctly noted that the government, that the agency, the scientists, said in advance of the necropsy study, we need to study 600 dolphins, or we won't get any results that are relevant to the question of population. And so obviously that's got to be the goal of the study. Obviously only 56 were done. Now, there is the argument that we did the study because we necropsied 56 dolphins, or one dolphin, or two, or however many the secretary determined, is, Judge Henderson called it Orwellian, which might be a little strong, but it did really, it was a very strong argument. And so I think that is a step too far. Congress does not say you need to do a study, and that's all. I mean, implicit in Congress's directive is that the study has to at least plausibly provide some evidence on the question. Now, it's certainly true the agency would have discretion to evaluate a study and say, here's what we're going to do, and we think this provides good evidence. And if all we did was say we think that was a bad study, I wouldn't be here on this issue. But it's not us that's saying that. The agency itself admits that the study was useless. So they didn't conduct the study that Congress requested them to conduct. They necropsied 56 dolphins to obtain no information. The only real question is whether they're excused from doing what Congress told them to do because it was effectively impossible. And I think, you know, and I hate to point the court back to our briefs, but I think the brief sets out very clearly. Mexico offered to cooperate. The Secretary made no effort. Colombia offered to cooperate. The Secretary made no effort. Ecuador and Venezuela offered to cooperate. And the Secretary came in at the very last second and got a few people trained and took a few and performed a portion of the study. As Judge Henderson indicated, this is not a record that shows a Secretary who is trying to do the right thing and is thwarted or is making serious efforts. The Secretary just did not want to do the studies and did not do them, notwithstanding clear direction from Congress and an indication from this Court in the first decision that those studies were important and they had to do what Congress told them to do. If I may, I'd like to emphasize one final thing. Because really the crux of the dispute here is whether there is some evidence supporting the conclusion that there's no significant adverse impact. So even setting aside all of the internal memoranda that show the science doesn't support no, but we have political reasons and here's what we're going to do, and that's all set out in the brief and it's clear Secretary Powell was interested. From the final finding itself, from the register, I'd like to quote from which is Excerpt of Record 5 on page 6036. It's the middle column near the bottom. This is what they have to say. Now, how is that analysis? That's not a citation to, oh, this study suggests one thing, this study suggests something else, we're thinking about it. This says we can't prove it one way or the other. Therefore, there's no significant adverse impact. And I submit that that is exactly what the Secretary did in the first case. Did not have enough information to be certain, even though all the evidence pointed one way, and said we are not certain, therefore, it's okay to set nets on dolphins. Here, the Secretary... What would be, we would have found the evidence. We didn't find it, so it's not so. It's not, we attempted to find the evidence. I think that's what the Secretary is saying. I think that may be what the Secretary's counsel is saying, Your Honor, but that is not what the Secretary is saying. What the Secretary said in the Federal Registry, which, in the Federal Register, is that we don't know yet, and more information is needed. Now, prior to writing that statement for consumption in the Federal Register, the internal documents show that they did know, but even accepting at face value, they say we need more information, therefore, we're going to say no. Notwithstanding the fact that there was plenty of information to show that it couldn't be the environment, and that it could be, even though we aren't 100% certain, the fishery, and that there's no third alternative. So really what is happening here is they're doing... The Secretary in 2002 did exactly what he had done in 1999, a different person, but exactly what had been done in 1999, and defaulted to a position of changing the dolphin labeling, dolphin-safe labeling standard because he was not absolutely certain. And this Court, the first panel of this Court, was extremely clear that the Secretary could not do that, could not use lack of 100% certainty to default to a position of changing the label. And... Kagan. Okay. Sorry. I'm sorry. I didn't mean to... No. I was... Okay. Going back to the question of what the studies, the statute talked about, what is your position with respect to the government saying that we just, that it was just an impossibility to do the number of studies that were contemplated by Congress? Right. Our position, Your Honor, is that that is not what is in the record. And what Judge Henderson concluded from the record, and the record is set out in our briefs, is that several foreign countries, I mean, the principal foreign countries that fish in this manner, offered to cooperate, wanted to cooperate, and the Secretary either did not take those offers up in a couple cases or dragged his feet. Well, I mean, ask on the more interesting legal question. Suppose that we're impossible. Suppose he's right. We have to kind of defer to the mechanics of how they go about this and what they find when they do it. Legally, what is your position? Suppose that they're right that they couldn't do it. Right. I think legally, Your Honor, and one thing I should mention, no. Legally, Your Honor, our position is that if it were truly impossible and if they tried, they would be excused. Okay. Thank you. Unless there's anything further, I see that my time is up and I will submit on the papers. Thank you. I think I am at this Court's indulgence on my rebuttal time, but I do want to make some points here. The first is this is a case, this is an administrative procedure review case, okay? There are no factual findings in an administrative procedures review case. It is de novo review. There is absolutely no basis to suggest that in an APA review case you would have an abusive discretion standard. In scientific battles such as this, this is exactly. What are you talking about? In, in, in. In reviewing what? Excuse me? In scientific issues where there is evidence on both sides, such as there is here in an APA case, the agency gets the most discretion and it's very much entitled to that in this case. And the problem here and the problem below is the district court cannot replace its review of the facts with what the agency reviewed, and that's the fundamental problem. Finally, if I can just address the 1414A factors, which Your Honor had talked about. There are stress studies that are required. There's also in subsection B other research, and that's really kind of the point here is that you can't just focus on the stress studies, which, by the way, if you read the plain language, says a three-year series of necropsy samples. There's no suggestion in the plain language that it has to be a population-based factor. And finally, on remand, on the remand issue, if this Court does determine that there's a problem, the case really should be remanded. The only real case that the other side has cited is the Sierra Club case. There was a very simple case, there was a very simple issue there where the question was, was the wind blowing, basically, the question was, was the wind blowing west or was the wind blowing north? EPA said it was blowing north. This Court said, no, we looked at it. It's blowing west. You can't go back and undo that. That was the only question here. This is much more complicated, and the agency's got to be entitled to deference to make its priority decisions. And with that, did you have a question, Justice Breyer? Justice Breyer. Yes. The one thing I think you may have moved over a little too fast, you suggest three years, we did three years, and it's over. He suggests that the goal, the reason you were doing it over three years was to get a sufficient sample to draw some conclusions. So if you do it over three years, but you say we only had one dolphin one of those years, we only had, I don't remember the numbers now, and it's not sufficient, it's because the study was not sufficient, as I gather is the argument. Earth Island just said that it was very possible for us to do that, and there's no evidence in the record that we couldn't have done the studies. Let me quote to you from the letter that they wrote to the agency in 1999. We strongly recommend that NIMPS provide to members of Congress a full explanation of the problems encountered, including clarification of the Commerce Secretary's finding mandate, the limitations of science in making absolute determinations, and the lack of cooperation by Mexico and other ETP tuna fishing nations. What you heard here in oral argument is the direct opposite of that, which is putting all the burden on the agency. They were asking for an explanation, as I understand. No. They said go to Congress and tell Congress about the lack of cooperation from these other agencies. And now you're hearing in their briefs. Statute. No. Is that what that means? No. Quote, go to Congress and tell them about the lack of cooperation by Mexico and other And with that, we would ask that the district court be reversed or in the alternative that this be remanded back to the agency for further findings. Thank you. Thank you, counsel. The case just argued is submitted for decision. And that concludes the Court's calendar for this morning. The Court stands adjourned. All rise. This Court, for this session, now stands adjourned.
judges: Schroeder, Farris, Rawlinson